Joyce Marie WICKEN, as Trustee for the Next–of–Kin of Donald Leroy Wicken, Eleanor Jarvi, as Trustee for the Next–of–Kin of Wiljo Alvar Jarvi, Respondents,

v.

Winston MORRIS, Defendant,

Ronald Fields, Petitioner, Appellant,

and

Nitrochem, Inc., a foreign corporation, Defendant.

No. C7–93–1159.

Supreme Court of Minnesota.

Feb. 3, 1995.

Robert J. Terhaar, Thomas F. Ascher, Cosgrove, Flynn, Gaskins & O'Connor, Minneapolis, for appellant.

Edward J. Matonich, David A. Arndt, Matonich & Persson, Chartered, Hibbing, for Wicken.

Thomas R. Thibodeau, Johnson, Killen, Thibodeau & Seiler, Duluth, for Jarvi.

Allen W. Hinderaker, Brian N. Johnson, David H. Wright, Thomas Mielenhausen, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for defendant.

## OPINION

STRINGER, Justice.

Donald Wicken and Wiljo Jarvi, employees of the Nitrochem Energy Corporation (NEC) manufacturing plant in Biwabik, Minnesota, were killed as a result of an explosion at the plant on November 3, 1989. The explosion occurred as the two men attended a fire intended to dispose of MS–80, a blasting agent composed primarily of aluminum nitrate material and manufactured by NEC.

The Biwabik plant was established by Dow Chemical in the early 1960s for the purpose of manufacturing blasting agents for the mining industry in northeastern Minnesota. In 1976, Dow Chemical sold the manufacturing plant to Nitrochem, Inc., a Canadian corporation (formerly Energy Science & Consultants). Nitrochem, Inc. owned Nitrochem Corporation, a United States corporation,

which in turn owned NEC. NEC manufactured explosive materials, including MS–80.

In 1981, NEC expanded to a national market and developed a new process for producing packaged MS–80. The packaged MS–80 blasting product frequently failed to detonate properly, resulting in the return of thousands of pounds of unused MS–80 to NEC. Initially, NEC stored the unused MS–80 in trailers. NEC eventually stored the MS–80 in plastic bags on the ground in an outside gravel pit. Between 1983 and November 1989, over one million pounds of discarded MS–80 accumulated at the NEC plant, although NEC had disposed of a substantial portion of the rejected blasting agent by the time of the explosion.

In August 1985, officials from the Minnesota Pollution Control Agency (MPCA) inspected the Biwabik plant. Concerned about potential ground water contamination, the MPCA issued a notice of violation to NEC in October 1985, instructing it to develop a disposal plan for the discarded MS–80 within 45 days. The MPCA authorized NEC to burn a small portion of the product. NEC also recycled some of the MS–80, but when NEC developed a new blasting product series (ML) that was incompatible with MS–80, recycling ceased to be a disposal option.

In September 1988, Nobel Insurance Company (Nobel Insurance), NEC's liability carrier, inspected the plant. Nobel Insurance notified NEC that the discarded blasting product constituted a potential environmental and fire hazard and instructed NEC to properly store or dispose of the product.

Following the Nobel Insurance inspection, NEC's production manager, Philip Kinsman, and Nitrochem, Inc., exchanged a series of correspondence regarding potential disposal methods. Kinsman was apparently reluctant to burn the product, but was under a great deal of pressure from Nitrochem, Inc. management to dispose of the product quickly. Kinsman resigned his position in March 1989, accepting another position within the company. Defendant Ronald Fields assumed the position as NEC production manager. He became NEC plant general manager later that year.

In August 1989, Nobel Insurance conducted a second plant inspection, again directing NEC to store the product until proper disposal methods were developed. Fields agreed to "try our very best" to accomplish this task by the end of the year. Under pressure from Nitrochem management to dispose of the product, Fields consulted Kinsman regarding the burning procedure. Fields apparently believed he needed a permit only from the Department of Natural Resources (DNR), and claims he was unaware that the burning procedure also required a permit from the MPCA.

On November 2, 1989 Fields applied for a DNR permit, but told the DNR forestry technician he only intended to burn wood and paper boxes. The DNR forestry technician who signed the permit testified he told Fields on the telephone that an MPCA permit was required if he intended to burn other materials. When Fields picked up the DNR permit later that day, the forestry technician Fields had spoken with was absent. Fields claims he told the DNR employee then present that he also intended to burn blasting material. The employee denies this conversation transpired. The agent was aware of the MPCA permit requirement and alleges he would not have informed Fields otherwise. Fields explains that he didn't bother to correct the DNR permit, which clearly limited the burning authorization to wood and paper, because he indeed did intend to burn wood and paper in addition to the blasting material.

The burn commenced the next day, on November 3, 1989. On that fateful day, Donald Wicken was tending the burn-pile with a front end loader and Wiljo Jarvi had just arrived at the burn site in a pick-up truck when the blasting material exploded. Wicken was killed instantly. Jarvi suffered severe injuries which ultimately resulted in his death one year later.

Decedents' next-of-kin brought a negligence action against Nitrochem and NEC manager Ronald Fields, asserting Fields breached a personal duty owed to his co-employees. Fields moved for summary judgment, and Nitrochem moved for dismissal for lack of personal jurisdiction. The district court denied both motions and both parties

separately appealed.[1] The court of appeals remanded the jurisdiction issue raised by Nitrochem (Case No. C9–93–1048) to the district court for reconsideration.[2] The court affirmed the denial of summary judgment as to the claims against Fields, stating "[i]f Fields acted fraudulently in obtaining the permit, thereby breaching a personal duty, the facts could support a determination of co-employee liability." *Wicken v. Morris*, 510 N.W.2d 246, 251 (Minn.App.1994). We granted Fields' petition for further review to resolve the question of the liability of co-employees whose conduct allegedly causes job related injuries. We reverse the court of appeals and order judgment in favor of defendant, Fields.

 The workers' compensation laws of Minnesota were designed to provide remedies for employees injured as a result of job-related activities.[3] Under our Workers' Compensation Act, Minn.Stat. § 176.001 *et seq.*, an employee is precluded from bringing an action for damages against his or her employer. Minn.Stat. § 176.031 (1992). An employee may, however, bring an action against a co-employee for the latter's negligence under certain limited circumstances. *Dawley v. Thisius*, 304 Minn. 453, 455, 231 N.W.2d 555, 557 (1975). In order for an employee to establish a negligence claim against a co-employee, the injured employee must satisfy a two-prong test designed to limit the liability of co-employees.

First, the injured employee must establish that the co-employee had a personal duty toward the employee, the breach of which resulted in the employee's injury, and that the activity causing the injury was not part of the co-employee's general administrative responsibilities. *Id.*

The acts of negligence for which a co-employee may be held liable must be acts constituting direct negligence toward the plaintiff, tortious acts in which he participated, or which he specifically directed others to do. A co-employee may be held liable when, through personal fault as opposed to vicarious fault, he breaches a duty owed to plaintiff. Personal liability, however, will not be imposed on a co-employee because of his general administrative responsibility for some function of his employment without more. He must have a personal duty towards the injured plaintiff, breach of which has caused plaintiff's damage.

*Id.* at 557–58 (citations omitted).

Second, the injury must arise from gross negligence on the part of the co-employee. Minn.Stat. § 176.061, subd. 5(c) (1992) ("[a] coemployee working for the same employer is not liable for a personal injury incurred by another employee unless the injury resulted from the gross negligence of the coemployee or was intentionally inflicted by the coemployee.").

Plaintiffs claim to have met the first prong of the co-employee liability test, alleging Fields violated a personal duty to his co-employees when he failed to disclose that he intended to burn the explosive material, thus obtaining the DNR burn permit by fraud. We do not agree.

 The personal duty to co-employees contemplated in *Dawley* is no different than the duty any individual owes another arising from normal daily social contact—the duty to refrain from conduct that might reasonably be foreseen to cause injury to another. *See, e.g., Johnson v. Ramsey County*, 424 N.W.2d 800 (Minn.App.1988) (personal duty not to batter employees), *pet. for rev. denied* (Minn., Aug. 24, 1988); *Parker v. Tharp*, 409 N.W.2d 915 (Minn.App.1987) (personal duty not to assault co-employees).

1. By its order filed on June 29, 1993, the court of appeals consolidated the appeals for consideration and disposition. On January 20, 1995 this court filed its order *nunc pro tunc* severing the consolidation and allowing the matters to proceed separately, effective after the court of appeals decision.

2. On remand, the district court again concluded that Nitrochem was subject to jurisdiction in Minnesota. The court of appeals affirmed the district court's ruling. *Wicken v. Morris*, No. C7–94–1219, 1994 WL 664944 (Minn.App. Nov. 29, 1994), *pet. for rev. denied* (Minn., Jan. 20, 1995).

3. Decedents' spouses received benefits pursuant to the Workers' Compensation Act.

Fields' application for the DNR permit does not fall within this category of personal duty because it was not an action directed toward his co-employees as required by *Dawley,* 304 Minn. at 455, 231 N.W.2d at 557. Rather, the permit application was an administrative activity required as an integral part of Fields' employment obligations. In *Dawley,* this court specifically held such administrative duties immune from liability. *Id.*

Plaintiffs Wicken and Jarvi and the court of appeals rely upon a theory of "but for" causation.[4] The court of appeals concluded that the fraud in obtaining the DNR permit extended beyond an administrative responsibility, holding that "Fields' acts in circumventing these procedures led to the burning of the MS–80, which in turn led to the deaths of Jarvi and Wicken." *Wicken,* 510 N.W.2d at 250–51. This court has expressed dissatisfaction with the "but for" theory of causation. In *Harpster v. Hetherington,* 512 N.W.2d 585, 586 (Minn.1994), we stated that the "but for" test "converts events both near and far, which merely set the stage for an accident, into a convoluted series of 'causes' of the accident. * * * Not only does the 'but for' test obfuscate the legal doctrine of causation, but it distorts the basic tort concept of duty." *Id.*

Moreover, Fields' duty to obtain proper burn permits cannot establish a causal connection between Fields' fraudulent permit application and the tragic explosion. The regulatory scheme requiring Fields to obtain a MPCA permit before burning was not designed to protect employee safety. Violation of a pollution control regulatory scheme cannot be the underpinning of liability because the safety of Wicken and Jarvi was not the interest intended to be protected by the MPCA regulatory scheme. *See* Minn.Stat. § 116.01 (1992).

The duty to provide employees with a safe workplace is a non-delegable duty held by the employer. *Dawley,* 304 Minn. at 455, 231 N.W.2d at 557. This is a fundamental premise upon which the workers' compensation laws are based. The seemingly harsh result of holding a co-employee immune from liability arising from breach of the employer's duty to provide a safe workplace is a necessary part of the statutory scheme, as it maintains the integrity of the compromise between employers and employees implemented by the legislature pursuant to Minn.Stat. § 176.061, subd. 5(c). The scheme of workers' compensation is one of reciprocal concessions by the employer and employees. *Boryca v. Marvin Lumber & Cedar,* 487 N.W.2d 876, 879, n. 3 (Minn.1992). "In exchange for guaranteed compensation for injury regardless of * * * fault or solvency of at-fault fellow employees, the employee is limited to a fixed schedule of recovery and gives up any right to a common law action against the employer." *Id.* (citation omitted). To hold otherwise, permitting co-employee liability when harm results however indirectly from the carrying out of administrative obligations incident to work responsibilities would eviscerate the fundamental purpose of the workers' compensation laws.

Respondents failed to show that Fields breached a personal duty to co-employees. Fields' conduct was in performance of his administrative responsibilities as an employee of NEC. Consequently, we need not reach the question whether Fields' conduct was grossly negligent within Minn.Stat. § 176.061, subd. 5(c). Accordingly, we reverse the court of appeals and remand to the district court for entry of judgment in favor of defendant Fields.

Reversed and remanded with instructions for the entry of judgment.

---

4. The trial court also stated in its Findings of Fact: "[b]ut for the illegal permit there would have been no burn."